

**FILED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MAR 15 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JOHANNES T. MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LIVING ESSENTIALS, LLC, | ) |
| | )     1:17-cv-02020 |
| | )     Judge John J. Tharp, Jr |
| Defendant. | )     Magistrate Judge Geraldine Soat Brown |

**COMPLAINT**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**................................................................................................................I,II

**INTRODCTION**............................................................................................................................1

**THE RECORD FOR HACKY SACK**...................................................................................................2

**STATEMENT OF FACTS**................................................................................................................4

**STATEMENT OF CASE**.................................................................................................................4

**THE RIGHT OF PUBLICITY**...........................................................................................................6

**THE STATUTE OF LIMITATIONS OF THE IL RIGHT OF PUBLICITY ACT**..........................................12

**THE LANHAM ACT**....................................................................................................................16

**FALSE ENDORSEMENT UNDER THE LANHAM ACT**......................................................................17

**FALSE ADVERTISING UNDER THE LANHAM ACT**.........................................................................25

**STANDING UNDER THE FALSE ADVERTISING ARM OF THE LANHAM ACT**...................................27

**CONCLUSION AND RELIEF REQUESTED**......................................................................................29

**TABLE OF AUTHORITIES**

**Cases:**

Abdul Jabar v. General Motors, 75 F. 3d 1391 (9th Cir. 1996)............................................................24

Ali v. Playgirl, Inc., 447 F. Supp. 723 (S.D.N.Y. 1978)......................................................................8

Allen v. National Video Inc. 610 F. Supp. 612-1985.........................................................................23

AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979)........................................................19,20

Berry v. Ford Models, Inc., 525 F. App'x 451 (7th Cir. 2013)............................................................15

Blair v. Nevada Landing Partnership, 369 Ill. App. 3d 318 (2006).....................................................14

Carson v. Here's Johnny Portable Toilets Inc., 698 F.2d 831 (1983).....................................................8

Henley v. Dillard Department Stores, 46 F. Supp. 2d 587 (N.D. Tex. 1999).......................................8

Jordan v. Jewel Food Stores, Inc. 743 F.3d 509 (7th Cir. 2014)..........................................................11

Lexmark v. Static Control Components, Inc., 134 S. Ct. 1337 (2014).............................................27,28

Motschenbacher v. R.J. Reynolds Tobacco Co., 498 F.2d 821 (9th Cir. 1974).....................................8

Toney v. L'Oreal USA, Inc., No. 02 C 3002 (N.D. Ill. 2002)..........................................................13,14

Waits v. Frito-Lay, Inc., 978 F.2d 1093-1992....................................................................................23

White v. Samsung America, Inc. 971 F .2d 1395 (1992).............................................................8,18-24

**Statutes:**

735 ILCS 5/13-205.............................................................................................................................13

765 ILCS 1075/5...........................................................................................................................4,6,7

765 ILCS 1075/10.................................................................................................................................6

765 ILCS 1075/15...............................................................................................................................12

765 ILCS 1075/30.........................................................................................................................4,6,9,11

765 ILCS 1075/35...............................................................................................................................10

765 ILCS 1075/40...............................................................................................................................11

765 ILCS 1075/45.................................................................................................................................12

765 ILCS 1075/60.............................................................................................................................9,14

**U.S. Code:**

15 U.S.C. § 1125 (The Lanham Act)..............................................................................................5,16-29

**INTRODUCTION**

My name is Ted Martin. I hold the record for most consecutive kicks of a footbag. (a.k.a. Hacky Sack) My record is commonly referred to as either "the footbag world record" or "the record for Hacky Sack". This record is the most prestigious and coveted title in the sport of footbag. I am universally recognized as the record holder by every authority, including the Chicago Tribune, the World Footbag Association, Guinness World Records, and I have even been featured on an Upper Deck trading card. (Exhibit A)

In a nationally televised commercial that can viewed if you Google "The Last Five Hours: Bigfoot", an actor states, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all this? 5-hour ENERGY." Living Essentials, LLC produced this commercial to market the product 5-hour ENERGY. The mere use of the term "the record for Hacky Sack" in a television commercial for the product 5-hour ENERGY violates my right of publicity under the IL Right of Publicity Act. (765 ILCS 1075/) How the term "the record for Hacky Sack" was used is a violation of both the false endorsement and false advertising arms of the Lanham Act. (15 U.S. Code § 1125)

The jurisdiction of this Court for my right of publicity claim is invoked under 28 USC § 1332. (Diversity) I am a citizen of the State of Illinois. I have maintained my principal residence at my present location in the State of Illinois for the past 25 years. Living Essentials, LLC is a citizen of the State of Michigan. Living Essentials, LLC was incorporated in the State of Michigan in 2000 and also maintains its principal place of business (corporate nerve center) in the State of Michigan. I seek damages well in excess of $75,000. This Court has original jurisdiction for my claims under the Lanham Act since these are federal questions.

This is my second complaint. In the original complaint, the Defendant claimed that the "the record for Hacky Sack" is a vague term and thus not a reference to my particular record. The Court accepted this argument in spite of the fact that I am a documented world record holder and produced an article from the Chicago Tribune that stated, "Playing Hacky Sack is a kick, right? You can probably knock that dinky footbag around a time or two or three before it hits the floor. Not bad champ. Now imagine kicking it 51,155 consecutive times. That's the world record for Hacky Sack, or footbag, kicks, set by Ted Martin, 37, of Des Plaines. He did it 7 hours, 1 minute and 37 seconds in '93 and made the Guinness Book of World Records."(Exhibit B) In addition to this, the court stated that I brought suit for "right of privacy" when in fact I brought suit under the IL Right of Publicity Act. The court also chided me for not having a sense of humor as if I were suing Saturday Night Live for spoofing me in a skit. Parody is not recognized as a defense to any of my claims under the Lanham Act or the IL Right of Publicity Act. (IRPA) The court also incorrectly applied a one year statute of limitations to my IRPA claim. For the reasons just stated, the court dismissed my case with prejudice. I was thus not even allowed a chance to respond.

The United States Court of Appeals for the Seventh Circuit dismissed my case for failure to state claim. I am Pro Se and will endeavor to state my claim as clearly as possible this time around. My failure to state claim should not reflect on the merits of my case. I made the same mistake that many lawyers apparently do; I assumed the court would be knowledgeable on the field of law that was applicable to

1

my case. I never even contemplated otherwise until I read the following Quote from page #117 of the Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit.

"Many appellate lawyers write briefs (and make oral arguments) in a manner that assumes that judges are knowledgeable about every field of law, however specialized. This assumption is incorrect. Counsel should keep in mind that federal judges are generalists. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 350 (7th Cir. 2012). Individual judges have specialized knowledge of a few fields of law, depending on the judge's career before he or she became a judge or on special interests developed since, but the appellate practitioner cannot count on the three judges on the panel assigned to his case being intimate with the area of law in the appellate practitioner's case."

Your Honor, I wish I read the above quote before I filed my original complaint. I now realize that the laws that are applicable to this case might be relatively obscure in this district. I will try to make it as clear as possible how the Defendant violated my rights and how the applicable laws should be applied. However, for all of my claims to succeed, this Court must first recognize that "the record for Hacky Sack" is how the public refers to my particular record. I will begin by defining "the record for Hacky Sack".

## THE RECORD FOR HACKY SACK

The record for Hacky Sack is the record for the game of Hacky Sack. The objective of the game of Hacky Sack is to see how many consecutive kicks you can achieve without a miss. The record for Hacky Sack is the most consecutive kicks anyone has ever achieved. This is basic fundamental knowledge for anyone who has ever seen, played, or even heard of Hacky Sack. The public has been referring to this record as "the record for Hacky Sack" ever since Mike Marshal and John Stalberger invented the game in 1972.

It is literally impossible for the Defendant to have used "the record Hacky Sack" without knowing the meaning of the term. The only way that someone could not know the meaning of "the record for Hacky Sack" is if they had never heard of Hacky Sack in the first place. The Defendant had clearly heard of Hacky Sack and knew the meaning of "the record for Hacky Sack" since it was the Defendant that used the term in the first place. For the Defendant's lawyers to claim that the Defendant did not know the meaning of the term that they themselves used in a nationally televised commercial is not tenable and frankly insulting. The objective of the game of Hacky Sack is so obvious that the objective does not need to be explained to anyone who has ever seen the game played. I have been playing Hacky Sack since 1981 and have never had to explain the objective of the game to anyone, including very young children. In the remote chance that someone in the commercial audience had never heard of Hacky Sack and did not know the meaning of "the record for Hacky Sack", that person could do what everybody does when they don't know what something is. That person could simply Google "the record for Hacky Sack" and find out. (Exhibit C)

2

When you Google "the record for Hacky Sack", the cover page says: "the world record for hacky sack", "what is the record for hacky sack", "record for hacky sack hits", and finally, "what is the world record for hacky sack hits".

The first thing listed on "the record for Hacky Sack" Google Search page is the following quote,

"Now imagine kicking it 51,155 consecutive times. That's the world record for Hacky Sack, or footbag, kicks, set by Ted Martin, 37, of Des Plaines. He did it in 7 hours, 1 minute and 37 seconds in '93 and made the Guinness Book of World Records."

*This quote is from the Chicago Tribune article that I produced in Exhibit B. This quote establishes that "the record for Hacky Sack" is the record for most consecutive kicks, Ted Martin was the record holder as of 1993, and that my record was recognized by Guinness as a world record.

The first link on "the record for Hacky Sack" Google Search page is to the Chicago Tribune article itself.

The second link on "the record for Hacky Sack" Google Search page is to the World Footbag Association website which states right in the heading,

"Oct 23, 2013 ... Record Holder: Ted Martin / Des Plaines, Illinois, USA Category; Open Singles Footbag Consecutive. Date of Record: June 14, 1997"

*This heading clearly indicates that "the record for Hacky Sack" is held by Ted Martin. Opening this link reveals the current record to be 63,326 consecutive kicks.

Further down "the record for Hacky Sack" Google Search page is a link to a TMZ story about my original law suit. The link states right in the heading,

"Feb 27, 2015 ... 5-Hour Energy DOES NOT give you power to capture the hacky sack world record, according to the current record holder ... who's suing the ..."

*This story came out three days after I filed my original complaint. My original complaint was hand written and only one page long. The only exhibit I produced was a copy of my Upper Deck trading card. This was sufficient evidence for TMZ to declare that I am "the current record holder". Your Honor, TMZ, like the public at large, is well aware of the fact that "the record for Hacky Sack" is the record for most consecutive kicks. My Upper Deck trading card was proof enough that I am "the current record holder".

The Google Search of "the record for Hacky Sack" should be all the proof this Court needs to determine that "the record for Hacky Sack" is a specific reference to my particular record. To further prove that "the record for Hacky Sack" is a specific reference to my particular record; I have secured letters from seven Hacky Sack experts with impeccable credentials, including the co-inventor of Hacky Sack and the president of the World Footbag Association. After reading these letters, this Court should not have any doubt what-so-ever that "the record for Hacky Sack" is a specific reference to my particular record and that I am the record holder. (Exhibit D)

## STATEMENT OF FACTS

The actor in the 5-hour ENERGY commercial titled "The Last Five Hours: Bigfoot" makes the following statements: "I mastered origami, while beating the record for Hacky Sack." and "How do I do all this? 5-hour ENERGY."

I, Ted Martin, hold "the record for Hacky Sack" which currently stands at 63,326 consecutive kicks and was established on June 14, 1997.

## STATEMENT OF CASE

I am bringing suit against the Defendant for violating my right of publicity and violating my rights under both the false endorsement and false advertising arms of the Lanham Act. The laws that I invoke in this case are the cornerstones that govern advertising law. There is well established precedence in case law for each of my claims. However, it is rare if not unprecedented for a defendant to have violated all three of these laws in the same commercial. The damages available in relief are largely duplicative but I cite all three because the Defendant violated all three. There has never been a more flagrant violation of an individual's publicity rights. The Defendant went so far as to bring about a false advertising claim by asserting that "the record for Hacky Sack" was achieved because of 5-hour ENERGY.

The IL Right of Publicity Act strictly prohibits any use of an individual's identity for commercial purposes without having obtained previous written consent.

(765 ILCS 1075/30)
Sec. 30. Limitations regarding use of an individual's identity.
(a) A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.

The IRPA defines the terms used in the Act in Sec. 5. (765 ILCS 1075/5)

"Identity" means any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice.

I have conclusively shown in this complaint that "the record for Hacky Sack" is a specific reference to my particular record. "Identity" means any attribute of an individual that serves to identify that individual. The attribute in this case is my record. "The record for Hacky Sack" serves to identify this record holder.

"The record for Hacky Sack" is my "identity" as defined by the IL Right of Publicity Act.

4

"Commercial purpose" means the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising.

The Defendant used my identity in a nationally televised commercial for the product 5-hour ENERGY. The actor states, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all this? 5-hour ENERGY." The Defendant clearly used my identity for the purposes of advertising and promoting 5-hour ENERGY. The Defendant's television commercial falls squarely within the IRPA's definition of "commercial purpose". Under the IL Right of Publicity Act, any unauthorized use of an individual's identity for commercial purposes is a violation of that individual's right of publicity. The Defendant was not authorized to use my identity in this 5-hour ENERGY commercial. The Defendant should be found liable for violating my rights under the IL Right of Publicity Act.

Sec. 43(a)(1)(A) is the false endorsement arm of the Lanham Act. (15 U.S. Code § 1125) This section prohibits a person from using any false representation of fact that is likely to cause confusion as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship, or approval of his or her goods by another person.

The actor says, "I mastered origami, while beating the record for Hacky Sack." This is a material false representation of fact. The actor did not beat the record for Hacky Sack. With this statement the actor assumes my identity as the record holder. The actor then says "How do I do all this? 5-hour ENERGY." With this statement the actor emphasizes his sponsorship and approval of 5-hour ENERGY based on the false representation of fact that he beat the record for Hacky Sack. The Defendant should be found liable for violating my rights under Sec. 43(a)(1)(A) of the Lanham Act.

Sec. 43(a)(1)(B) is the false advertising arm of the Lanham Act. (15 U.S. Code § 1125) This section prohibits a person from using any false representation of fact that misrepresents the nature, characteristics, or qualities of his or her or another person's goods.

The actor says, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all this? 5-Hour ENERGY." The Defendant is directly asserting that "the record for Hacky Sack" was achieved because of 5-hour ENERGY. The statements made in this commercial are false representations of fact. The actor did not beat the record for Hacky Sack and did not beat the record for Hacky Sack because of 5-hour ENERGY. The Defendant made these statements with the clear intent to misrepresent the nature, characteristics, and qualities of 5-hour ENERGY.

"The record for Hacky Sack" was unequivocally not achieved because of 5-hour ENERGY. I have never used 5-hour ENERGY, do not endorse 5-hour ENERGY, and 5-hour ENERGY was not even available for use when I set "the record for Hacky Sack" on June 14, 1997. Living Essentials, LLC was not incorporated until 2000. The Defendant's statements are demonstrably false and parody is not a recognized defense when used to misrepresent the nature, characteristics, and qualities of the Defendant's own product. The Defendant should be found liable for violating my rights under Sec. 43(a)(1)(B) of the Lanham Act.

5

**THE RIGHT OF PUBLICITY**

The right of publicity is often described as the "inherent right of every human being to control the commercial use of his or her identity." J. Thomas McCarthy, Melville B. Nimmer and the Right of Publicity: A Tribute, 34 U.C.L.A.L. Rev. 1703, 1704 (1987) After all, it is the individual that did all of the hard work that constitutes their identity. The law recognizes this and grants the individual the right to control their identity for commercial purposes. The IL Right of Publicity Act grants every individual the right to control their identity for commercial purposes.

(765 ILCS 1075/10)
Sec. 10. Recognition of right of publicity. The right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity. (Source: P.A. 90-747, eff. 1-1-99.)

A person is strictly prohibited from using an individual's identity for commercial purposes without having obtained previous written consent.

(765 ILCS 1075/30)
Sec. 30. Limitations regarding use of an individual's identity.
(a) A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.
(b) If the individual's death occurs after the effective date of this Act, a person may not use that individual's identity for commercial purposes for 50 years after the date of the individual's death without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

The IL Right of Publicity Act was written clearly and concisely and this Court should have no trouble interpreting the meaning of the Act. The IL Right of Publicity Act defines the key terms used in the Act to prevent any possible confusion as to the intent of the lawmakers.

(765 ILCS 1075/5)
Sec. 5. Definitions. As used in this Act:
"Commercial purpose" means the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising.

"Identity" means any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice.

6

"Individual" means a living or deceased natural person, regardless of whether the identity of that individual has been used for a commercial purpose during the individual's lifetime.

"Juristic person" means a partnership, trust, estate, corporation, unincorporated association, or other organization capable of suing and being sued in a court of law.

"Name" means the actual name or other name by which an individual is known that is intended to identify that individual.

"Person" means a natural or juristic person.

"Work of Fine Art" means (i) a visual rendition including, but not limited to, a painting, drawing, sculpture, mosaic, videotape, or photograph; (ii) a work of calligraphy; (iii) a work of graphic art including, but not limited to, an etching, lithograph, serigraph, or offset print; (iv) a craft work in materials including, but not limited to, clay, textile, fiber, wood, metal, plastic, or glass; or (v) a work in mixed media including, but not limited to, a collage, assemblage, or work consisting of any combination of items (i) through (iv).
(Source: P.A. 90-747, eff. 1-1-99.)

There are only three elements that need to be established for a defendant to be held liable under the IL Right of Publicity Act. These elements are (1) identity, (2) commercial purpose, and (3) lack of consent.

The IRPA specifies that consent must be "previous written consent" in Sec. 30. The Defendant did not obtain my previous written consent to use my identity in this 5-hour ENERGY commercial.

"Commercial purpose" means the public use or holding out of an individual's identity "for purposes of advertising or promoting products". My identity was used in a television commercial for purposes of advertising and promoting 5-hour ENERGY. This clearly meets the definition of commercial purpose.

"Identity" means "any attribute of an individual that serves to identify that individual". Every credible authority has confirmed that "the record for Hacky Sack" is a specific reference to my particular record. "The record for Hacky Sack" is an attribute that serves to identify this plaintiff and only this plaintiff. "The record for Hacky Sack" is my "identity" as defined by the IL Right of Publicity Act. The IRPA's definition of "identity" is itself an affirmation of numerous court rulings under common law.

The right of publicity was originally part of the right of privacy under common law. Professor Dean Prosser wrote an influential article in 1960 that delineated four distinct types of the right of privacy: (1) intrusion upon one's seclusion or solitude, (2) public disclosure of embarrassing private facts, (3) publicity which places one in a false light, and (4) appropriation of one's name or likeness for the defendant's advantage. Prosser, Privacy, 48 Calif. L. Rev. 383, 389 (1960) The first three types continued to be referred to as the right of privacy. (The right to be let alone) The fourth and last type came to be known as the right of publicity. However, the courts did not hold that the right of publicity protected only an individual's "name or likeness". The courts held that the law protected an individual's "identity".

7

The law makers who wrote the IL Right of Publicity Act defined "identity" to mean "any attribute of an individual that serves to identify that individual". This definition of "identity" was well established under common law. Here are a few of the more well-known common law right of publicity cases:

Motschenbacher v. R.J. Reynolds Tobacco Co., 498 F.2d 821 (9th Cir. 1974)
This case involved the unauthorized use of a picture of a distinctive race car in a television commercial. The court held that a picture of a distinctive race car that was associated with the plaintiff violated the plaintiff's right of publicity even though the driver's features were not visible.

Ali v. Playgirl, Inc., 447 F. Supp. 723 (S.D.N.Y. 1978)
This case involved a drawing of a nude black male with taped hands and outstretched arms sitting on a stool in the corner of a boxing ring. The drawing was captioned "Mystery Man" but the individual depicted was identified in an accompanying verse as "the Greatest". Former heavyweight boxing champion Muhammad Ali routinely referred to himself as "the Greatest". The court held that the plaintiff's common law right of publicity was violated even though his name was not used.

Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831 (6th Cir. 1983)
This case involved the unauthorized use of a distinctive catch phrase. Plaintiff Johnny Carson was introduced every night as host of "The Tonight Show" with the phrase "Here's Johnny". This phrase was clearly associated with the plaintiff. The phrase in this case was not even used to describe an individual, but rather as a joking reference to the portable toilet itself. The defendant went even further with the word play by use of the phrase, "The World's Foremost Commodian". The court found that the plaintiff's right of publicity was violated. This case set the precedent that any unauthorized use of an individual's identity for commercial purposes is a violation of that individual's right of publicity.

White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir. 1992)
This case involved a print ad that featured a robot dressed in a wig, gown, and jewelry posing next to a mock "Wheel of Fortune" game show set. Plaintiff Vanna White was the hostess for "Wheel of Fortune". The ad clearly invoked her identity through the most unconventional of means. The court found in favor of the plaintiff for her common law right of publicity claim and her Lanham Act false endorsement claim. The court explicitly rejected the defendant's parody defense on both of these claims.

Henley v. Dillard Department Stores, 46 F. Supp. 2d 587 (N.D. Tex. 1999)
This case involved a joking reference to Don Henley, the lead singer of The Eagles. The defendant ran a newspaper advertisement for a shirt known as a "henley". The ad featured the photograph of a man wearing a henley shirt with the words, "This is Don" in large print and an arrow pointing toward the man's head. The ad included a second arrow pointing to the shirt that said, "This is Don's henley". The court granted Summary Judgment to the plaintiff for his right of publicity claim even though the man in the ad bore no resemblance to the plaintiff.

On January 1, 1999, the IL Right of Publicity Act supplanted common law right of publicity in the State of Illinois with a more robust and well defined law that favors the individual in many ways.

8

(765 ILCS 1075/60)
Sec. 60. Rights and remedies. The rights and remedies provided for in this Act are meant to supplant
those available under the common law as of the effective date of this Act, but do not affect an
individual's common law rights as they existed before the effective date of this Act. Except for the
common law right of publicity, the rights and remedies provided under this Act are supplemental to
any other rights and remedies provided by law including, but not limited to, the common law right of
privacy.
(Source: P.A. 90-747, eff. 1-1-99.)

Here are some of the ways that the IL Right of Publicity Act is more favorable the individual:

*The IRPA extends the right of publicity to every individual regardless of whether the identity of
that individual has been used for a commercial purpose during the individual's lifetime.

*The IRPA requires that consent must be in writing whereas common law right of publicity may have
allowed a defendant to claim verbal or implied consent.

*The IRPA defines the key terms used in the Act to eliminate any possible confusion as to the intent
of the law makers.

*The IRPA extends an individual's right of publicity for 50 years after the date of the individual's death.

*The IRPA states the only unauthorized uses of an individual's identity for which the Act does not apply.

*The IRPA specifically states what monetary relief is available to the plaintiff.

*The IRPA has a statute of limitations of 5 years whereas the statute of limitations under common law
right of publicity was only one year.

(765 ILCS 1075/30)
Sec. 30. Limitations regarding use of an individual's identity.
(a) A person may not use an individual's identity for commercial purposes during the individual's lifetime
without having obtained previous written consent from the appropriate person or persons specified in
Section 20 of this Act or their authorized representative.

The IL Right of Publicity Act is the broadest of the laws I invoke in this case. The IRPA prohibits the use
of an individual's identity for commercial purposes without having obtained previous written consent.
The Defendant in this case was in violation of my right of publicity the moment the Defendant used
"the record for Hacky Sack" and "5-hour ENERGY" in the same commercial.

In my original complaint, the Defendant argued that their commercial was a parody in such a way as to
suggest that parody was a legitimate defense to a right of publicity claim. Parody was explicitly rejected
as a legitimate defense in many common law cases. Parody is not recognized as a legitimate defense
under the IL Right of Publicity Act either. The only unauthorized uses of an individual's identity for which
the IL Right of Publicity Act does not apply are specifically stated in the following section.

(765 ILCS 1075/35)

Sec. 35. Applicability.

(a) This Act applies to acts or events that take place after the effective date of this Act.

(b) This Act does not apply to the following:

(1) use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work, provided that the performance, work, play, book, article, or film does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services;

(2) use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign;

(3) use of an individual's name in truthfully identifying the person as the author of a particular work or program or the performer in a particular performance;

(4) promotional materials, advertisements, or commercial announcements for a use described under paragraph (1), (2), or (3) of this subsection; or

(5) use of photographs, videotapes, and images by a person, firm, or corporation practicing the profession of photography ("professional photographer") to exhibit in or about the professional photographer's place of business or portfolio, specimens of the professional photographer's work, unless the exhibition is continued by the professional photographer after written notice objecting to the exhibition has been given by the individual portrayed.

(Source: P.A. 90-747, eff. 1-1-99.)

Your Honor, parody is the Defendant's only defense in this case. As a matter of law, parody is not a defense to any of my claims. Commercial advertisements routinely use parody and humor as a devise to deliver the message that the advertiser wishes to convey. In my original complaint, the court accepted parody as a legitimate defense because the court was unfamiliar with advertising law and the court, like the public, is used to seeing people impersonated on television shows like Saturday Night Live.

Right of publicity law protects the "inherent right of every human being to control the commercial use of his or her identity." J. Thomas McCarthy, Melville B. Nimmer and the Right of Publicity: A Tribute, 34 U.C.L.A.L. Rev. 1703, 1704 (1987) It is the **"commercial use"** of an individual's identity that the law seeks to protect.

Saturday Night Live is permitted to parody individuals under Sec. 35(b)(1) of the IL Right of Publicity Act because it is not commercial speech. Saturday Night Live is permitted to parody individuals "provided that the performance … does not constitute in and of itself a commercial advertisement for a product".

This case involves a true commercial advertisement for the product 5-hour ENERGY. Even if Saturday Night Live was the venue for this commercial advertisement, the Defendant would still be liable for violating my rights under the IL Right of Publicity Act. In addition to this, the Court can clearly see that "parody" is not listed in Section 35 as a use of an individual's identity for which the Act does not apply.

The IL Right of Publicity Act's strict prohibition against any unauthorized **"commercial use"** of an individual's identity was put to the test in the following case.

Jordan v. Jewel Food Stores, Inc. 743 F.3d 509 (7th Cir. 2014)
This case involved a full-page ad congratulating former Bull's superstar Michael Jordan on the occasion of his induction into the Basketball Hall of Fame. The ad appeared in a special commemorative issue of Sports Illustrated Presents which was devoted exclusively to Jordan's remarkable career.

Jewel was offered free advertising space in the issue in exchange for agreeing to stock the magazine in its stores. Jewel accepted the offer from Sports Illustrated and ran an ad congratulating Jordan on being inducted into the Basketball Hall of Fame. The ad featured the "Jewel-Osco" logo and the defendant's marketing slogan was linked to Jordan in the text of the congratulatory message that said, "as we honor a fellow Chicagoan who was 'just around the corner' for so many years."

Jordan brought suit under the IL Right of Publicity Act and the Lanham Act. Jewel maintained that the ad was "noncommercial speech" and thus entitled to full First Amendment protection. The district court held that the ad was fully protected noncommercial speech and entered judgment for Jewel.

The United States Court of Appeals, Seventh Circuit reversed the district court's decision saying, "The ad is commercial speech and thus is subject to the laws Jordan invokes here." Jordan later settled this case. Jordan was also victorious at trial in a case against Dominick's for running a similar congratulatory ad in the same issue of Sports Illustrated Presents.

Your Honor, Jordan's cases demonstrate that any use of an individual's identity for commercial purposes without having obtained previous written consent is a violation of that individual's right of publicity. The IL Right of Publicity Act states with specificity the penalty for violating an individual's right of publicity.

(765 ILCS 1075/30)
Sec. 30. Limitations regarding use of an individual's identity.
(a) A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/40)
Sec. 40. Violations; monetary relief.
(a) A person who violates Section 30 of this Act may be liable for either of the following, whichever is greater:
(1) actual damages, profits derived from the unauthorized use, or both; or
(2) $1,000.
(b) Punitive damages may be awarded against a person found to have willfully violated Section 30 of this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/45)

Sec. 45 Establishment of profits.

In establishing profits under paragraph (1) of subsection (a) of Section 40 of this Act:

(a) the plaintiff is required to prove the damages or gross revenue attributable to the unauthorized use; and

(b) the defendant is required to prove properly deductible expenses.

(Source: P.A. 90-747, eff. 1-1-99.)

Besides actual damages and the profits derived from the unauthorized use of an individual's identity, the IL Right of Publicity Act allows for punitive damages to be awarded against a person found to have willfully violated Section 30 of the Act.

In this case, the Defendant not only chose to use "the record for Hacky Sack" but went so far as to claim that this plaintiff's record was achieved because of 5-hour ENERGY. It is very difficult to imagine a more willful violation of an individual's right of publicity than a case where the defendant actually takes credit for the reason for the individual's fame.

According to iSpot.tv., the Defendant's fraudulent message that "the record for Hacky Sack" was achieved because of 5-hour ENERGY was delivered to the public via 382 national television airings. This Court should award punitive damages reflecting the Defendant's incredibly willful conduct.

Your Honor, I respectfully ask that this Court grant this plaintiff discovery. I wish to determine the gross revenue derived from the unauthorized use of my identity. I would also like to see all of the internal documents and communications related to the production of this commercial. While the Defendant's willfulness should be obvious, I would like the Court to see the Defendant's fraudulent intent in violating my rights first hand. Discovery should make it absolutely clear that the Defendant deliberately used my identity in an effort to suggest that 5-hour ENERGY is some sort of performance enhancing substance.

## THE STATUTE OF LIMITATIONS OF THE IL RIGHT OF PUBLICITY ACT

The IL Right of Publicity Act classifies the rights of the individual under the Act to be property rights.

(765 ILCS 1075/15)

Sec. 15. Transferability, descendability, and divisibility.

The rights under this Act are property rights that are freely transferable in whole or in part to any person either by written transfer, including but not limited to wills and trusts, or by interstate succession only to an individual's spouse, parents, children, and grandchildren, except that the rights under this Act are not subject to levy or attachment and may not be the subject of a security interest. Nothing in this Section limits the ability of any party to levy, attach, or obtain a security interest in the proceeds of the rights under this Act or the proceeds of the exercise of those rights.

(Source: P.A. 90-747, eff. 1-1-99.)

The previous section makes it clear that an individual's rights under the IL Right of Publicity Act are property rights. In addition to this, the heading of the IL Right of Publicity Act states in big bold letters **PROPERTY**. (Exhibit E) To determine the statute of limitations for the IL Right of Publicity Act, the Court must look to the compiled statutes of limitations for **PROPERTY** in the State of Illinois.

The statute of limitations varies depending on the particular type of property involved. There is not a specific reference to the right of publicity in the compiled statutes. This means that the statute of limitations that applies to the IL Right of Publicity Act is five years as stated in the following section:

(735 ILCS 5/13-205) (from Ch. 110, par. 13-205)
Sec. 13-205. Five year limitation. Except as provided in Section 2-725 of the "Uniform Commercial Code", approved July 31, 1961, as amended, and Section 11-13 of "The Illinois Public Aid Code", approved April 11, 1967, as amended, actions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.
(Source: P.A. 82-280.)

The statute of limitations for the IL Right of Publicity Act can only be properly determined in the manner described above. The court in the following case found that the statute of limitations period that applied to the IL Right of Publicity Act is five years.

Toney v. L'Oreal USA Inc. No. 02 C 3002 (N.D. Ill. 2002)
This case involved the use of the plaintiff's photograph beyond the time allowed for in a contract. The defendant argued that Section 301 of the Copyright Act preempted Toney's IRPA claim. The defendant also argued that the IL Right of Publicity Act had a one year statute of limitations and therefore her claim under the IRPA was time barred. The court rejected the defendant's time barred argument with the following statement:

"Alternatively, the Defendants argue that Plaintiff's claim under the Illinois Right of Publicity Act should be dismissed because it is time barred by a one year statute of limitations. This Court rejects such argument. Defendants, try to equate the Illinois Right of Publicity Act with the right of privacy which has a one year statute of limitations. However, these two rights are clearly different. 'It is true that the rights of publicity and of privacy evolved from similar origins; however, whereas the right of privacy protects against intrusions on seclusion, public disclosure of private facts, and casting an individual in a false light in the public eye, the right of publicity protects against the unauthorized exploitation of names, likenesses, personalities, and performances that have acquired value for the very reason that they are known to the public.' Baltimore Orioles, 805 F.2d at 678. The Illinois Right of Publicity Act does not explicitly, within the statutory provisions of the Act, provide for a statute of limitations. Because there is no statute of limitations explicitly specified within the confines of the Act, this Court finds that the statute of limitations that applies in this instance is 735 ILCS 5/13-205, which provides a five-year period to commence civil actions related to, among other things, injury done to real or personal

property and also, civil actions not otherwise provided for. Plaintiff alleges that Wella purchased the Ultra Sheen Supreme line brand from L'Oreal on or about December 2000. Plaintiff filed her complaint on March 20, 2002; which is clearly within the time frame mandated by the five year statute of limitations applicable here."

The court rejected the defendant's time barred argument but did find that Toney's IRPA claim was preempted by Section 301 of the Copyright Act. Toney appealed. The United States Court of Appeals, Seventh Circuit reversed the district court's preemption ruling, let stand the statute of limitations ruling, and remanded the case for trial.

Your Honor, I am on the record in my original complaint as stating that I first viewed this commercial on the internet in March of 2013. This is well within the time frame mandated by the five year statute of limitations applicable to a claim under the IL Right of Publicity Act.

In my original complaint, the Defendant argued that the statute of limitations of the IL Right of Publicity Act is the same as the one year limitations period applicable to a right of publicity claim under common law. This argument is specious on its face. The IL Right of Publicity Act does not amend common law right of publicity; the IL Right of Publicity Act supplants common law right of publicity.

(765 ILCS 1075/60)
Sec. 60. Rights and remedies. The rights and remedies provided for in this act are meant to supplant those available under the common law as of the effective date of this Act, but do not affect an individual's common law rights as they existed before the effective date of this Act. Except for the common law right of publicity, the rights and remedies provided under this Act are supplemental to any other rights and remedies provided by law including, but not limited to, the common law right of privacy.
(Source: P.A. 90-747, eff. 1-1-99.)

Supplant means to "supersede" or "take the place of". Common law right of publicity no longer exists in the State of Illinois. This case is governed by the IL Right of Publicity Act and nothing from common law right of publicity is applicable to this case, including the statute of limitations.

In my original complaint, the Defendant cited Blair v. Nevada landing Partnership 369 Ill. App. 3d 318 (2006) as proof that the IL Right of Publicity Act has a one year statute of limitations. If anything, this case highlights the need for the IRPA's requirement that consent be in writing.

In Blair, the plaintiff was asked by his employer to do a photo shoot where the plaintiff pretended to be dining at the Buckingham Steakhouse. The plaintiff was told the photographs would be used for promotional purposes and the plaintiff verbally consented. In 1995, about six months after the photo shoot, the plaintiff's photo appeared on fliers, brochures, signs, billboards, restaurant menus, calendars, and postcards. The plaintiff resigned his employment with the defendant in 1999. The plaintiff claimed that he complained about the use of his photo in 2000, but the defendant claimed that the plaintiff did not complain until January 2004 at which time the defendant immediately stopped using the plaintiff's photo.

The plaintiff filled a complaint on September 14, 2004 alleging a single common-law claim of appropriation of likeness. The plaintiff filed an amended complaint adding a claim under the IL Right of Publicity Act on July 14, 2005.

Having determined that the cause of action accrued in 1995, the court correctly ruled that the case was governed by common law. The statute of limitations for a right of publicity claim under common law is one year. The court dismissed the case as time barred.

The court also dismissed as time barred, the plaintiff's unsubstantiated claim that he withdrew his consent in 2000. For this claim, the court literally assumed that the statute of limitations of the IL Right of Publicity Act was the same as a right of publicity claim under common law. The court stated:

"The Right of Publicity Act does not identity a specific statute of limitations. However, since the Right of Publicity Act completely supplanted the common-law tort of appropriation of likeness (765 ILCS 1075/60 (West 2002)), we find applicable the one-year statute of limitations that pertained to the common-law tort."

The court's assumption was incorrect but the plaintiff was not arguing that the IRPA had a five year statute of limitations and it would not have mattered if he did. The plaintiff's claim was filed more than five years after the unsubstantiated cause of action.

While the court's incorrect assumption did not matter in that case, defense lawyers have tried to characterize the court's inconsequential assumption as a presidential ruling that was the product of well- reasoned careful deliberation. Defense lawyers use this case in an attempt to persuade judges to shorten the statute of limitations of the IL Right of Publicity Act to one year.

The district court in Berry v. Ford Models, Inc., 525 F. App'x 451 (7th Cir. 2013) cited Berry for its determination that the IL Right of Publicity Act has a one year statute of limitations. The United States Court of Appeals, Seventh Circuit expressly refused to affirm that decision with the following quote:

"This litigation is frivolous, and though both parties devote much effort arguing about the timeliness of Berry's claim, we see no point in deciding a question of Illinois law in a case where the statute of limitations --- whether one year or five --- could not possibly make a difference".

In my original complaint, the district court cited Berry and ruled that the IL Right of Publicity Act has a one year statute of limitations. The United States Court of Appeals, Seventh Circuit once again did not affirm the district court's statute of limitations ruling but did dismiss my case for failure to state claim.

I have clearly stated my claim in this case. "The record for Hacky Sack" is my "identity" as defined by the IL Right of Publicity Act. The Defendant used my "identity" for commercial purposes without having obtained my previous written consent. The IRPA strictly prohibits the unauthorized use of an individual's identity for commercial purposes. This complaint was filed well within the five year statute of limitations period applicable to an IRPA claim and is therefore timely. The Defendant should be found liable for violating my rights under the IL Right of Publicity Act.

15

## THE LANHAM ACT

(a) Civil Action

    (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

        (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

        (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

        shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Your Honor, the law listed above is Sec. 43(a) of the Lanham Act. (15 U.S. Code § 1125) Sec. 43(a)(1)(A) is commonly referred to as the false endorsement arm of the Lanham Act. Sec. 43(a)(1)(B) is commonly referred to as the false advertising arm of the Lanham Act.

Both arms of the Lanham Act require the Defendant not to engage in false or misleading advertising. Any argument put forth by the Defendant that requires the consumer to recognize and disregard a false or misleading advertisement should be rejected by this Court. It is not incumbent upon the consumer to determine that an advertisement is false or misleading and then disregard the advertisement; it is incumbent upon the defendant not to engage in false or misleading advertising in the first place.

Typically, when a court determines that the statements made in the challenged advertisement are "literally false"; the court may grant relief without considering the consumer's reaction to the ad. The statements made in this case are "literally false" and parody is not a defense to a false endorsement claim or a false advertising claim in which the defendant misrepresents the nature, characteristics, or qualities of the defendant's own product.

**FALSE ENDORSEMENT UNDER THE LANHAM ACT**

The Lanham Act prohibits an advertiser from using a person's identity in a manner that is likely to cause confusion as to the "affiliation, connection, or association" of the advertiser with that person or as to the approval the advertiser's "goods, services, or commercial activities" by that person.

Sec. 43(a)(1)(A) is the false endorsement arm of the Lanham Act and is as follows:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which---

is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

I have conclusively shown that "the record for Hacky Sack" is a specific reference to my particular record and that I am the record holder. Google knows that "the record for Hacky Sack" is a specific reference to my particular record and that I am the record holder. This means that every interested party on planet Earth with access to the internet knows that Ted Martin is the Hacky Sack record holder.

My identity as the record holder is invoked in this case by a false representation of fact. The actor says, "I mastered origami, while beating the record for Hacky Sack." The actor is claiming to have mastered origami while beating the record for Hacky Sack. Only the record holder can claim to have done anything while beating the record for Hacky Sack. The Defendant willfully and shamelessly identifies the actor as the Hacky Sack record holder, as Ted Martin, with this statement.

The Defendant goes even further with the following statement. The actor says, "How do I do all this? 5-hour ENERGY." The Defendant not only emphasizes the actor's approval of 5-hour ENERGY based on the false representation of fact that he is the record holder; but has the unmitigated gall to claim that "the record for Hacky Sack" was achieved because of 5-hour ENERGY.

The statements made in this commercial are material false representations of fact. The actor did not beat "the record for Hacky Sack" and the actor did not beat "the record for Hacky Sack" because of 5-hour ENERGY. The Defendant's false representations of fact are likely to deceive the consumer as to the approval of 5-hour ENERGY by Hacky Sack record holder Ted Martin. The "mastered origami" part of the statement and associated graphic is a parody of Hacky Sack record holder Ted Martin.

The United States Court of Appeals, Ninth Circuit made it abundantly clear in the following case that parody is not a defense to a false endorsement claim.

17

White v. Samsung Electronics America, Inc., 971 F.2d 1395 (1992)

This case involved a print ad that featured a robot dressed in a wig, gown, and jewelry. The robot was posed next to a mock "Wheel of Fortune" game show set.

The United States Court of Appeals, Ninth Circuit concluded that the ad was clearly meant to depict Wheel of Fortune game show hostess Vanna White. The Appeals Court had this to say:

"Viewed separately, the individual aspects of the advertisement in the present case say little. Viewed together, they leave little doubt about the celebrity the ad is meant to depict. The female-shaped robot is wearing a long gown, blond wig, and large jewelry. Vanna White dresses exactly like this at times, but so do many other women. The robot is in the process of turning a block letter on a game-board. Vanna White dresses like this while turning letters on a game-board but perhaps similarly attired Scrabble-playing women do as well. The robot is standing on what looks to be the Wheel of Fortune game show set. Vanna White dresses like this, turns letters, and does this on the Wheel of Fortune game show. She is the only one. Indeed, defendants themselves referred to their ad as the "Vanna White" ad. We are not surprised."

The defendant claimed a parody defense to White's false endorsement claim under the Lanham Act. The United States Court of Appeals, Ninth Circuit had this to say on the defendant's parody defense.

"In defense, defendants cite a number of cases for the proposition that their robot ad constituted protected speech. The only cases they cite which are even remotely relevant to this case are Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) and L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26 (1st Cir. 1987). Those cases involved parodies of advertisements run for the purpose of poking fun at Jerry Falwell and L.L. Bean, respectively. This case involves a true advertisement run for the purpose of selling Samsung VCRs. The ad's spoof of Vanna White and Wheel of Fortune is subservient and only tangentially related to the ad's primary message: 'buy Samsung VCRs.'

Defendants parody arguments are better addressed to non-commercial parodies. The difference between a 'parody' and a 'knock-off' is the difference between fun and profit."

The United States Court of Appeals, Ninth Circuit ruled in favor of plaintiff Vanna White on both her right of publicity claim and her Lanham Act false endorsement claim and remanded the case for trial.

White v. Samsung Inc. and Martin v. Living Essentials, LLC both involve a parody of the person depicted in the advertisement. In White v. Samsung Inc., the person depicted was indirectly identified as the Wheel of Fortune game show hostess, as Vanna White. In Martin v. Living Essentials, LLC the person depicted was directly identified as the Hacky Sack record holder, as Ted Martin.

Did I master origami or use two footbags while beating "the record for Hacky Sack" as depicted in the commercial? No, the commercial is a parody of Hacky Sack record holder Ted Martin. Is Vanna White a robot as depicted in the ad? No, the advertisement is a parody of Wheel of Fortune game show hostess Vanna White. The United States Court of Appeals Court, Ninth Circuit rejected parody as a defense in White v. Samsung Inc. This Court should reject parody as a defense in Martin v. Living Essentials, LLC.

18

When a false endorsement case does not involve a false statement; the court must determine whether a likelihood of confusion exists. Deciding the false endorsement claim in favor of plaintiff Vanna White; the United States Court of Appeals, Ninth Circuit looked for guidance to the 8-factor test enunciated in AMF. Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).

According to AMF, the 8 factors relevant to a likelihood of confusion are as follows: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

The United States Court of Appeals, Ninth Circuit's comments in White on those factors are as follows:

"In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona. See Allen, 610 F.Supp. at 627. The 'strength" of the mark refers to the level of recognition the celebrity enjoys among members of society. See Academy, 944 F.2d at 1455. If Vanna White is unknown to the segment of the public at whom Samsung's robot ad was directed, then that segment could not be confused as to whether she was endorsing Samsung VCRs. Conversely, if White is well-known, this would allow the possibility of a likelihood of confusion. For the purposes of the Sleekcraft test, White's 'mark' or celebrity identity, is strong.

In cases concerning confusion over celebrity endorsement, the plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame. Because White's fame is based on her televised performances, her 'goods' are closely related to Samsung's VCRs. Indeed, the ad itself reinforced the relationship by informing its readers that they would be taping the 'longest-running game show' on Samsung's VCRs well into the future.

The third factor, 'similarity of marks,' both supports and contradicts a finding of likelihood of confusion. On the one hand, all of the aspects of the robot ad identify White; on the other, the figure is quite clearly a robot, not a human. This ambiguity means that we must look to the other factors for resolution.

The fourth factor does not favor White's claim because she has presented no evidence of actual confusion.

Fifth, however, White has appeared in the same stance as the robot from the ad in numerous magazines, including the covers of some. Magazines were used as the marketing channels for the robot ad. This factor cuts toward the likelihood of confusion.

Sixth, consumers are not likely to be particularly careful in determining who endorses VCRs, making confusion as to their endorsement more likely.

Concerning the seventh factor, 'defendant's intent,' the district court found that, in running the robot ad, the defendants had intended a spoof of the 'Wheel of Fortune.' The relevant question is whether the defendants 'intended to profit by confusing consumers' concerning the endorsement of Samsung VCRs. Toho, 645 F.2d 788. We do not disagree that defendants intended to spoof Vanna White and 'Wheel of

Fortune.' That does not preclude, however, the possibility that defendants also *1401 intended to confuse consumers regarding endorsement. The robot ad was one of a series of ads run by defendants which followed the same theme. Another ad in the series depicted Morton Downey Jr. as a presidential candidate in the year 2008. Doubtless, defendants intended to spoof presidential elections and Mr. Downey through this ad. Consumers, however, would likely believe, and would be correct in so believing, that Mr. Downey was paid for his permission and was endorsing Samsung products. Looking at the series of advertisements as a whole, a jury could reasonably conclude that beneath the surface humor of the series lay an intent to persuade consumers that celebrity Vanna White, like celebrity Downey, was endorsing Samsung products.

Finally, the eighth factor, 'likelihood of expansion of product lines,' does not appear apposite to a celebrity endorsement case such as this."

The United States Court of Appeals, Ninth Circuit ruled in favor of plaintiff Vanna White in this case.

The United States Court of Appeals, Ninth Circuit summarily rejected parody as a defense but sought guidance from the 8-factor test enunciated in AMF, Inc. v. Sleekcraft Boats to determine if there was a likelihood of confusion that White was endorsing Samsung VCRs.

Martin v. Living Essentials, LLC involves parody. Whether or not a commercial advertisement involves parody is not relevant to a false endorsement claim. This Court should summarily reject parody as a defense. The relevant question is whether the defendant intended to profit by confusing consumers concerning the endorsement of 5-hour ENERGY. The actor in this case identifies himself as the Hacky Sack record holder and then not only endorses 5-hour ENERGY but claims that "the record for Hacky Sack" was achieved because of 5-hour ENERGY. The Defendant clearly intended to profit by confusing consumers.

The defendant in Martin v. Living Essentials, LLC directly identifies the actor as the Hacky Sack record holder by use of a false representation of fact. The "literally false" statement in this commercial creates a "likelihood of confusion" in and of itself. However, let's apply the seven applicable factors enunciated in AMF, Inc. v. Sleekcraft Boats to Martin v. Living Essentials, LLC.

(1)Strength of plaintiff's mark; in cases involving confusion over endorsement by a celebrity plaintiff, "mark" means the celebrity's persona. The "strength" of the mark refers to the level of recognition the celebrity enjoys among members of society. Except for a period of 50 days in 1997, I have held "the record for Hacky Sack" since 1988. I am universally recognized as the record holder by every authority, including the World Footbag Association, Guinness World Records, the Chicago Tribune, Upper Deck, and Google. My "mark" or "celebrity identity" is strong.

(2)Relatedness of goods; in cases concerning confusion over celebrity endorsement, the plaintiff's "goods" concern the reason for or source of the plaintiff's fame. The reason for and source of my fame is "the record for Hacky Sack". Under the Lanham Act, "the record for Hacky Sack" is considered to be my "goods". The Defendant connected my "goods" with the Defendant's "goods" in the most unseemly manner imaginable. The Defendant claimed that my "goods" were achieved because of 5-hour ENERGY.

(3)Similarity of the marks; the actor appropriates my "persona" by the use of a false representation of fact. The actor says, "I mastered origami, while beating the record for Hacky Sack." Do not be deceived, this is not a look-alike case. I am not famous for my looks. I am famous for my achievement. The actor asserts that he beat "the record for Hacky Sack". In this particular case, the "likelihood of confusion" actually increases if the public cannot identify the record holder by his looks. However, whether the actor looks like me or not is not relevant. The Defendant positively identifies the actor as the Hacky Sack record holder. The actor is a human male who does somewhat resemble the picture of myself on my Upper Deck trading card but that is not the point. The Defendant could have replaced the actor with a robot or anything else and still be blatantly appropriating my "persona".

(4)Evidence of actual confusion; White did not produce any evidence of actual confusion and the court still found the defendant liable. I will produce evidence of actual confusion at the end of this segment.

(5)Marketing channels used; this commercial had 382 national television airings according to iSpot.tv. The actor says, "I mastered origami while beating the record for Hacky Sack." The actor is claiming that he is the Hacky Sack record holder. A "literally false" statement such as this creates confusion in and of itself. For the consumer to not think that the actor is the record holder would require the consumer to determine that the advertisement is false and disregard the advertisement. Under the Lanham Act, it is not incumbent upon the consumer to make this determination; it is incumbent upon the advertiser to not make false or misleading statements.

(6)Likely degree of purchaser care; consumers are not likely to be particularly careful in determining who endorses 5-hour ENERGY, making confusion as to endorsement more likely.

(7)Defendant's intent in selecting the mark; The Defendant's intent is clearly stated in the commercial by the false representations of fact. The Defendant not only wanted the consumer to believe that the Hacky Sack record holder was endorsing 5-hour ENERGY, but also that "the record for Hacky Sack" was achieved because of 5-hour ENERGY. My mark was selected because of the concentration, athleticism, strength, and endurance needed to achieve "the record for Hacky Sack". The Defendant wanted the consumer to believe that 5-hour ENERGY will give the consumer all of these traits.

Your Honor, a "literally false" statement creates confusion in and of itself. A blogger commented on my original lawsuit. The title of the blog was, "Hacky Sack World Record Holder Is Filing A Stupid Lawsuit". The reason that the blogger thinks I am filing a stupid lawsuit makes my case. (Exhibit F)

The blogger has an enlargement of my Upper Deck trading card picture on the front page. The blogger also offers a link to the offending commercial in this case. The blogger has clearly seen the commercial and put a lot of effort into analyzing this commercial. To begin with, the blogger recognizes that this plaintiff is the Hacky Sack world record holder. In addition to this, the blogger thinks that I am actually the actor in the commercial despite having my picture right in front of him. I never claimed that I was the actor. The actor claimed that he was the Hacky Sack record holder. This is the power of suggestion!

The blogger's comments regarding this commercial are as follows:

21

"This is probably some of the most ridiculous s**t I've ever heard. Hacky sack hall of famer Ted Martin is filing a lawsuit against the company 5-hour Energy. Martin has held a Guiness World Record for hacky sack since 1997. It's one thing to be a professional athlete, but another to be a pro hacky sacker. So what 's this lawsuit even about?

Martin holds a few hacky sack records like hacking for over 8 hours with a total of 63,326. He was just featured in the 5-Hour Energy drink commercial, and he's mad that the company has made false claims about him. In the commercial they claim that "he mastered origami while beating the record for hacky sack", but Martin says that this is "literally false" information. He feels as if the company made it look like the drink took his belt, and it was the reason he won.

He has a lawsuit that he has hand written and plans on claiming. He even wants the company to stop airing the commercial. The real question is that if he didn't use the 5-Hour Energy drink, then why did he agree to filming the commercial? He knew they were going to use false advertising and claim unrealistic things, he was aware. Chances are though, that the court is just going to laugh at him and throw it out. Check out the commercial on the next page."

Your Honor, the Defendant's false representations of fact caused this blogger to believe that I was "featured in the 5-Hour Energy drink commercial". This is evidence of actual consumer confusion as to my sponsorship and approval of 5-hour ENERGY.

The actor identifies himself as the Hacky Sack record holder when he says, "I mastered origami, while beating the record for Hacky Sack". The "mastered origami" part of the statement is clearly parody. The blogger understands the commercial to be a parody of Hacky Sack record holder Ted Martin.

The Court should also note that the Defendant is not contradictory in identifying the actor. The only time the actor identifies himself is when he says, "I mastered origami, while beating the record for Hacky Sack". The actor does not identify himself as any other individual in any of the other claims. The blogger clearly views the entire commercial, not just a portion of the commercial, as a parody of Hacky Sack record holder Ted Martin.

The blogger says, "The real question is that if he didn't use the 5-Hour Energy drink, then why did he agree to filming the commercial?"

The blogger assumes that I agreed to "filming the commercial" and that I am endorsing 5-hour ENERGY. The Defendant should be found liable for violating my rights under the false endorsement arm of the Lanham Act.

Your Honor, my identity in this case was invoked by a false representation of fact. The actor claims to have done something while beating the record for Hacky Sack. Every person who hears, "I mastered origami, while beating the record for Hacky Sack" will understand that the actor is claiming to be the Hacky Sack record holder. Many commercials employ parody with the consent of the person depicted in the commercial. Parody is not a defense to a false endorsement claim because the consumer just assumes that the person depicted consented to the parody.

22

In parody cases like White v. Samsung Inc. 971 F .2d 1395 (1992), look-alike cases like Allen v. National Video Inc. 610 F. Supp. 612-1985, and voice-alike cases like Waits v. Frito-Lay, Inc. 978 F .2d 1395 (1992); defense lawyers commonly try to manipulate the court with an assertion that goes something like this, "Nobody would believe that 'the individual depicted' is actually the plaintiff."

This defense is very manipulative. First, it suggests that nobody in their right mind would side with the plaintiff. Second, the Lanham Act does not require that the consumer believe 'the individual depicted' is actually the plaintiff. The Lanham Act prohibits actions which are "likely to cause confusion" as to the "affiliation, connection, or association" of the advertiser with the plaintiff or as to the sponsorship or approval of the advertiser's "goods, services, or commercial activities" by the plaintiff.

In the Memorandum in Support of Defendant's Motion to Dismiss in my original case, the Defendant stated on page #10, "The statements made are not intended to be believed and even an unsophisticated consumer could not reasonably believe that either (a) the actor is Plaintiff; or (b) the actor actually beat 'Plaintiff's record.' The statements are not actionable."

Your Honor, I actually called the Judge's clerk in the original case and told her that I had evidence of actual confusion. This evidence was the blogger's post that I just presented. The clerk told me that it wasn't necessary for me to present that evidence at that time. This Pro Se plaintiff accepted that advice only to have my case dismissed with prejudice more than six months later.

Without evidence of actual confusion, defense lawyers can manipulate the court with this deceptive "not reasonably believe that ... the actor is Plaintiff" defense if the court unfamiliar with the Lanham Act and the court does not use a 'likelihood of confusion' test for guidance. In my original case, the court was unfamiliar with the Lanham Act and did not use a "likelihood of confusion" test for guidance.

In White v. Samsung, Inc., the United States Court of Appeals, Ninth Circuit used the seven applicable factors enunciated in AMF, Inc. v. Sleekcraft Boats, 599 F .2d 341 (9th Cir. 1979) to determine whether a "likelihood of confusion" existed. This is the most frequently used test in false endorsement cases.

The Ninth Circuit also sees by far the most Lanham Act false endorsement cases because of the high concentration of celebrities in that district. Therefore, the Ninth Circuit has the most experience with these types of cases and is a good place for this Court to seek guidance.

The "not reasonably believe that ... the actor is Plaintiff" defense is eviscerated by Sleekcraft factor 7; defendant's intent in selecting the mark. For this factor, the plaintiff need only show that the plaintiff is 'the individual depicted' in the commercial advertisement. It is a given that the defendant wants the consumer to believe that 'the individual depicted' is affiliated, connected, or associated with the defendant or the defendant would not have chosen the mark and used the mark in the commercial advertisement in the first place.

The defendant's intent in selecting the mark could be the most important factor. However, evidence of actual confusion is by far the most instructive factor in a Lanham Act false endorsement case.

White v. Samsung, Inc. makes it clear that parody is not a defense to a Lanham Act false endorsement claim. Putting parody aside, the following case is strikingly similar to Martin v. Living Essentials, LLC.

Abdul Jabar v. General Motors, 75 F. 3d 1391 (9th Cir. 1996)
The plaintiff's birth name was Lew Alcindor before he changed his name to Kareem Abdul Jabar.
The United States Court of Appeals, Ninth Circuit described the case as follows:

"This dispute concerns a GMC television commercial aired during the 1993 NCAA men's basketball tournament. The record includes a videotape of the spot, which plays as follows: A disembodied voice asks, 'How 'bout some trivia?' This question is followed by the appearance of a screen bearing the printed words, 'You're Talking to the Champ.' The voice then asks, 'Who holds the record for being voted the most outstanding player of this tournament?' In the screen appear the printed words, 'Lew Alcindor, UCLA, '67, '68, '69.' Next, the voice asks, 'has any car made the 'Consumer Digest's Best Buy' list more than once? (and responds:) The Oldsmobile Eighty-Eight has.' A seven-second film clip of the automobile, with its price, follows. During the clip, the voice says, 'in fact, it's made that list three years in a row. And now you can get this Eighty-Eight special edition for just *1394 $18,995.' At the end of the clip, a message appears in print on the screen: 'A Definite First Round Pick,' accompanied by the voice saying, 'it's your money.' A final printed message appears: 'Demand Better, 88 by Oldsmobile.'"

Concerning the plaintiff's Lanham Act false endorsement claim, the United States Court of Appeals, Ninth Circuit had the following to say:

"In considering celebrities' claims of violation under the Lanham Act, we have considered the following factors to determine whether a plaintiff has raised a genuine issue of material fact as to likelihood of confusion over endorsement: '(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark.' White, 971 F .2d at 1400.

*1398 The parties dispute the applicability of the factors. GMC concedes that the fifth factor, marketing channels, favors Abdul-Jabbar, but contests the rest. Because a jury could reasonably conclude that most of the factors weigh in plaintiff's favor, we hold that the question of whether Abdul-Jabbar's Lanham Act claim should succeed is a question for the jury."

In Abdul Jabar v. General Motors, the defendant used the printed words "You're Talking to the Champ." A voice asks, "Who holds the record for being voted the most outstanding player of this tournament?" The printed words respond, "Lew Alcindor, UCLA, '67, '68, '69." The defendant is directly asserting that "the record holder" is involved in the advertisement and is endorsing the defendant's product.

In Martin v. Living Essentials, LLC, the actor says, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all of this? 5-hour ENERGY." The defendant in this case is also directly asserting that "the record holder" is involved in the advertisement and is endorsing the defendant's product.

However, Living Essentials does not compare records. Living Essentials asserts that this plaintiff's record was achieved because of 5-hour ENERGY. This assertion is the basis for additional false advertising claim.

## FALSE ADVERTISING UNDER THE LANHAM ACT

The Lanham Act prohibits an advertiser from using any false representation of fact that misrepresents the nature, characteristics, or qualities of the advertiser's "goods".

The actor says, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all of this? 5-hour ENERGY." The "all of this" clearly includes "the record for Hacky Sack".

Every single consumer, including young children, will get the fraudulent message that the Defendant intended to convey: "The record for Hacky Sack" was achieved because of 5-hour ENERGY.

Even the description of this commercial on the iSpot.tv website restates this fraudulent message:

"So, what have you done in the last five hours? Just ask this man. He already proved the theory of relativity, mastered origami, beat the record for hacky sack, found Bigfoot and swam the English Channel … and back. How you may ask? Well, with 5-Hour Energy, of course."

All of the statements in this commercial misrepresent the nature, characteristics, and qualities of 5-hour ENERGY. All of the statements in this commercial are meant to suggest that 5-hour ENERGY is a performance enhancing substance. The actor says, "How do I do all of this? 5-hour ENERGY."

However, the only statements in this commercial that are of concern to this plaintiff and this Court are: "I mastered origami, while beating the record for Hacky Sack." and "How do I do all this? 5-hour ENERGY." These statements directly assert that "the record for Hacky Sack" was achieved because of 5-hour ENERGY. These statements are false representations of fact. The actor is not Hacky Sack record holder Ted Martin and "the record for Hacky Sack" was not achieved because of 5-hour ENERGY.

These statements misrepresent the nature, characteristics and qualities of 5-hour ENERGY.

These statements are a clear violation of my rights under the false advertising arm of the Lanham Act. The Defendant actually has the nerve to take credit for my record!

Sec. 43(a)(1)(B) is the false advertising arm of the Lanham Act and is as follows:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which---

in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

25

In an article titled, "9 Key Questions About Lanham Act False Advertising Suits" at an ALM website called Corporate Counsel; the authors' answer to the following question should be informative.

5. What if my competitor's advertising is literally true but is nevertheless misleading?

"Truthful advertising can give rise to a Lanham Act claim if found to covey a misleading message, despite the literally truthful language of the ad.

Generally speaking, Lanham Act plaintiffs can assert "literal" or "implied" claims. A literally false claim is one that is false on its face: "Product X relieves pain more effectively than Product Y," where Product Y is in fact more effective or just as effective as product X.

If a Lanham Act plaintiff persuades the court that the challenged advertisement is literally false, the court may grant relief without considering extrinsic evidence of consumer reaction to the ad."

The statements made in this commercial can only be determined to be "literally false". I have proved that "the record for Hacky Sack" is a specific reference to my record. "The record for Hacky Sack" was unequivocally not achieved because of 5-hour ENERGY. 5-hour ENERGY did not even exist as a product when I set "the record for Hacky Sack" on June 14, 1997. This Court should grant relief to this plaintiff without considering extrinsic evidence of consumer reaction to the ad.

The Defendant has put out a nationally televised commercial in which "the Hacky Sack record holder" is claiming that "the record for Hacky Sack" was achieved because of the Defendant's product.

The statements made in this commercial misrepresent the nature, characteristics, and qualities of the Defendant's product by asserting that 5-hour ENERGY is a performance enhancing substance.

To make matters worse, Lance Armstrong was stripped of seven Tour de France titles shortly before the release of this commercial in one of the biggest doping scandals in the history of sports.

The blogger's comments in Exhibit F clearly indicate that consumers are likely to believe that the actual Hacky Sack record holder consented to this commercial.

In this context, the Defendant has put out a nationally televised commercial in which Ted Martin is claiming that his record was achieved because of a performance enhancing substance.

The consumer can prescribe all sorts of negative aspersions to this plaintiff as a direct result of the Defendant's false representations of fact.

I shudder to think about the millions of consumers who viewed this commercial and what they must think of this plaintiff as the direct result of the Defendant's false representations of fact.

The Defendant's actions have caused severe damage to the commercial interest in my reputation. The Court should find the Defendant liable for violating my rights under the false advertising arm of the Lanham Act.

### STANDING UNDER THE FALSE ADVERTISING ARM OF THE LANHAM ACT

In the following case, the United States Supreme Court made clear in a unanimous decision how courts are to determine who has standing to bring suit under the false advertising arm of the Lanham Act.

Lexmark International. Inc. v. Static Control Components, Inc. No. 12-873. Decided March 25, 2014.

Lexmark sells the only style of toner cartridges that work with the company's laser printers. Each cartridge has a microchip that disables the empty cartridge unless Lexmark replaces the chip. Static Control developed a chip that mimics Lexmark's and sold the chip to "remanufactures" who refurbish and sell the used Lexmark cartridges in competition with Lexmark's own new and refurbished cartridges.

Lexmark brought suit for copyright infringement and Static Control counterclaimed alleging that Lexmark engaged in false and misleading advertising in violation of the Lanham Act.

Static Control maintained that Lexmark misled consumers into believing that they were legally bound to return the used cartridges to Lexmark after a single use.

In addition to that, the United States Supreme Court said that:

"Lexmark 'sent letters to most of the companies in the toner cartridge remanufacturing business' falsely advising those companies that it was illegal to sell refurbished Prebate cartridges and, in particular, that it was illegal to use Static Control's products to refurbish those cartridges." P. 3 Opinion of the Court.

The question raised by Lexmark in this case was whether Static Control had standing to bring suit under the Lanham Act.

The district court held that Static Control lacked "prudential standing" to bring a Lanham Act claim by applying the multifactor balancing test used in Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519.

The United States Court of Appeals, Sixth Circuit reversed that decision using the Second Circuit's "reasonable interest" test.

The Supreme Court rejected the use of all previously used balancing tests and made clear how the courts were to determine who had standing to bring suit on page #16 of the Opinion of the Court:

"While none of those tests is wholly without merit, we decline to adopt any of them. We hold instead that a direct application of the zone-of -interests test and the proximate-cause requirement supplies the relevant limits on who may sue."

The Supreme Court rejected the use of all previously used balancing tests but affirmed the United States Court of Appeals, Sixth Circuit's decision that Static Control had standing to sue under the Lanham Act.

On page #20 of the Opinion of the Court, the Supreme Court elaborated further on the question of standing with the following comments:

27

"As we have observed, a defendant who 'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product' may be said to have proximately caused the plaintiff's harm. *Bridge*, 553 U.S., at 657 (quoting Restatement (Second) of Torts § 870, Comment h (1997); emphasis added in *Bridge*).

The District Court emphasized that Lexmark and Static Control are not direct competitors. But when a party claims reputational injury from disparagement, competition is not required for proximate cause; and that is true even if the defendant's aim was to harm its immediate competitors, and the plaintiff merely suffered collateral damage."

Your Honor, I am claiming a reputational injury from disparagement by a defendant who sought to promote his own interests by telling a known falsehood about this plaintiff's record.

The United States Supreme Court made it clear in Lexmark v. Static Control that this plaintiff has standing to bring suit under the false advertising arm of the Lanham Act.

Finally, parody is not a defense to a false adverting claim in which the defendant misrepresents the nature, characteristics, and qualities of the defendant's own product.

Sec. 43(a)(3) is the exclusion section of the Lanham Act and is as follows:

> (3) Exclusions  The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:
>
> (A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—
>
> > (i)    advertising or promotion that permits consumers to compare goods or services; or
> >
> > (ii)   identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.
>
> (B) All forms of news reporting and news commentary.
> (C) Any noncommercial use of a mark.

Parody is a defense to a false advertising claim only when "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods and services of the famous mark owner."

The Defendant in this case is not "parodying, criticizing, or commenting" on my "goods"; the Defendant in this case is taking credit for my "goods" in an effort to misrepresent the nature, characteristics, and qualities of the Defendant's own product. Sec. 43(a)(3) does not list "parodying" the Defendant's own product as an exclusion.

There are good reasons why "parodying" the defendant's own product is not excluded from action.

Allowing a defendant to claim a parody defense in a case in which the defendant misrepresents the nature, characteristics, and qualities of the defendant's own product would leave the door open to a defense that said, "We were just kidding when we implied that our product could cure cancer." or in this case, "We were just kidding when we implied that our product is a performance enhancing drug."

The false advertising arm of the Lanham Act prohibits an advertiser from using any false or misleading messages regardless of whether those messages involve humor or parody; even truthful language can give rise to a claim if found to convey a misleading message.

The Defendant should be found liable for violating my rights under the false advertising arm of the Lanham Act.

## CONCLUSION AND RELIEF REQUESTED

In my original complaint, the Defendant made numerous false representations to the court regarding the meaning of "the record for Hacky Sack".

The public is well aware of the meaning of "the record for Hacky Sack". The Defendant clearly knew the meaning of "the record for Hacky Sack" and expected the commercial audience to know the meaning of "the record for Hacky Sack" as well.

However, I respectfully ask that this Court grant this plaintiff discovery. I seek all of the Defendant's internal documents and communications related to the production of this commercial in order to prove the degree to which the Defendant willfully violated my rights under the IL Right of Publicity Act.

I also request discovery to determine the gross revenue the Defendant received while this commercial was running in the market and an exact accounting of when and where this commercial was televised.

In my original complaint, the Defendant also made numerous false representations to the court as to the meaning and applicability of the laws that I invoke in this case.

The Defendant asserted that parody was a legitimate defense to all of my claims, that I lacked standing to bring suit under the Lanham Act, that my IRPA claim was time barred, and many other demonstrably false assertions as to the meaning and applicability of the laws that I invoke in this case.

The Defendant's assertions have been proven false in this complaint. The Defendant had no evidentiary support what-so-ever to back up those assertions. The Defendant's assertions were clearly made in an effort to harass this plaintiff, cause unnecessary delay, and needlessly increase the cost of this litigation. See FRCP Rule 11(b).

As much as the Defendant would like to confuse the Court; this case is really not that complicated.

In the 5-hour ENERGY commercial titled: "The Last Five Hours: Bigfoot" an actor states, "I mastered origami, while beating the record for Hacky Sack." and "How do I do all of this? 5-hour ENERGY."

I have conclusively shown that "the record for Hacky Sack" is a specific reference to my particular record and that I am the record holder.

Any unauthorized use of "the record for Hacky Sack" in a commercial advertisement is a violation of my rights under the IL Right of Publicity Act.

Anyone claiming to have done anything "while beating the record for Hacky Sack" is claiming to be the Hacky Sack record holder. The Defendant's assertion that the Hacky Sack record holder is endorsing 5-hour ENERGY is a blatant violation of my rights under the false endorsement arm of the Lanham Act.

The Defendant's assertion that "the record for Hacky Sack" was achieved because of 5-hour ENERGY is a blatant violation of my rights under the false advertising arm of the Lanham Act.

The Court should find the Defendant liable for violating my rights under the IL Right of Publicity Act, the false endorsement arm of the Lanham Act, and the false advertising arm of the Lanham Act.

Under the IL Right of Publicity Act, this plaintiff is entitled to actual damages and the profits derived from the unauthorized use of my identity. I seek actual damages and all of the Defendant's profits.

Under the false endorsement arm of the Lanham Act, this plaintiff is entitled to actual damages and all of the Defendant's profits earned during the time the deceptive advertising was running in the market. I seek actual damages and all of the Defendant's profits.

Under the false advertising arm of the Lanham Act, this plaintiff is entitled to actual damages and all of the Defendant's profits earned during the time the deceptive advertising was running in the market. I seek actual damages and all of the Defendant's profits.

For each of my claims, this plaintiff is entitled to actual damages and all of the Defendant's profits. However, the law does not allow for any duplicative damage awards and this plaintiff does not seek any duplicative damage awards.

Under the Lanham Act, the Court may award treble actual damages in exceptional cases. This is an exceptional case; the Defendant violated both the false endorsement and false advertising arms of the Lanham Act in the same commercial. I seek treble actual damages for my Lanham Act claims.

Under the IL Right of Publicity Act, punitive damages may be awarded for willful infringement. I seek punitive damages for willful infringement. It is not possible that the Defendant could have accidentally claimed that "the record for Hacky Sack" was achieved because of 5-hour ENERGY.

I seek in relief:

    (a) Treble actual damages.

    (b) All the Defendant's profits.

    (c) Punitive damages for willful infringement.

    (d) Court costs.

    (e) Any other relief that this Court may deem just and proper.

March 15, 2017                                   Respectfully Submitted,

Ted Martin

359 Woodbridge

Des Plaines, IL 60016

Phone: (847) 824-6528

Fax: (847) 824-6533

31

A

# **Exhibit A**



179

# Ted Martin

Inducted into the Footbag Hall of Fame in 2005.
Martin made an indelible mark on the sport in 1997
when he set the world record for consecutive
kicks (no knees) with an amazing total of 63,326.
The feat took over eight hours and 50 minutes.
Photo courtesy of Worldfootbag.com.





**2009 GOODWIN CHAMPIONS**

©2009 UDC, 985 Trade Drive, North Las Vegas, NV 89030. All rights reserved. Printed in the USA.

RLNT3



Martin,
(Haeky Saeker).

B

# Exhibit B

Case: 1:17-cv-02020 Document #: 1 Filed: 03/15/17 Page 39 of 61 PageID #:39



# 51,155 Hacky Sack kicks? Yup, you got that straight!

Playing Hacky Sack is a kick, right? You can probably knock that dinky footbag around a time or two or three before it hits the floor.

Not bad, champ. Now imagine kicking it 51,155 consecutive times. That's the world record for Hacky Sack, or footbag, kicks, set by Ted Martin, 37, of Des Plaines. He did it in 7 hours, 1 minute and 37 seconds in '93 and made the Guinness Book of World Records. How does he do it?

"I don't know sometimes," he says. "You get hypnotized by it. After a certain point, it becomes too easy. But then you lull yourself into a false sense of confidence."

So he tries to stay focused. "You listen to music sometimes, but you've just got to try to keep your concentration on the ball and don't get too relaxed. You can't be too tense either."

OK. Concentrate. Be relaxed. But don't be too relaxed. But don't get too tense. Got it.

Martin tries for 10,000 kicks a day. He also rides an exercise bike and runs on a treadmill. Sometimes he'll play hockey or basketball with buds. But, mainly, Hacky Sack is his bag.

—*Larry Mayer*

*Check out the Midwest Footbag Association's regional competition June 13-15 in Mt. Prospect. For info, call Scott Davidson at 773-237-9255. For more info on the sport, call the World Footbag Association at 800-878-8797.*



Tribune photo by Val Mazzenga
**Stand back, it's Ted Martin the Hacky Sack champ.**

# Exhibit C

Google+ Search Images Maps Play YouTube News Gmail More -

Sign in

the record for Hacky Sack

All    Images    Videos    News    Shopping    Maps    Books

About 61,400 results

**Any time**
Past hour
Past 24 hours
Past week
Past month
Past year

**All results**
Verbatim

Now imagine kicking it 51,155 consecutive times. That's the world record
for Hacky Sack, or footbag, kicks, set by Ted Martin, 37, of Des Plaines.
He did it in 7 hours, 1 minute and 37 seconds in '93 and made the
Guinness Book of World Records.

**51,155 Hacky Sack Kicks? Yup, You Got That Straight ...**
articles.chicagotribune.com/.../9706030198_1_hacky-sack-world-records-
kicks

**Current Footbag Guinness World Records | World Footbag**
worldfootbag.com/current-footbag-guinness-world-records/ ▾
Oct 23, 2013 ... Record Holder: Ted Martin / Des Plaines, Illinois, USA Category: Open Singles
Footbag Consecutive. Date of Record: June 14, 1997

**New Hacky Sack Record - YouTube**

https://www.youtube.com/watch?v=WAqqlokinHY
Jun 30, 2012 - 2 min - Uploaded by Leara Aomori
Tried to see how many I could hit and broke my old record of 118. 143
hits is my new record!!

**Footbag - Wikipedia**
https://en.wikipedia.org/wiki/Footbag ▾
Circle kicking is the most common game played with a footbag, and is often what people mean
when they use the term "hacky sack". Players stand in a circle and keep the bag moving
around the circle, with the goal of keeping the bag from touching the ground.
Equipment - Freestyle footbag - Footbag net - Circle kicking

**Hacky Sack World Records - RecordSetter**
https://recordsetter.com/Hacky-Sack-world-records ▾
20 Records ... Ken Somolinos. Ken Somolinos kept a duct tape hacky sack aloft for 52.75
seconds. Stride's setting 100 records in 100 days. At the end of 100 days, we'll verify if you are
the standing Record Holder

**Footbag FAQ: World Records - Footbag WorldWide**
www.footbag.org/faq/show/941274599 ▾
Dec 29, 2007 ... The Guinness Book of World Records has recognized footbag consecutives
world records since the 1980's. There are several categories of ...

**51,155 Hacky Sack Kicks? Yup, You Got That Straight ...**
articles.chicagotribune.com/.../9706030198_1_hacky-sack-world-records-kicks ▾
Jun 3, 1997 ... That's the world record for Hacky Sack, or footbag, kicks, set by Ted Martin,
37, of Des Plaines. He did it in 7 hours, 1 minute and 37 seconds in ...

**Footbag - most consecutive eclipses | Guinness World Records**
www.guinnessworldrecords.com/.../records/footbag-most-consecutive-eclipses ▾
The record for the most consecutive eclipses completed with a footbag is 26 and was set by
Alex Zerbe (USA) on the set of L'Ete De Tous Les Records, ...

**Hacky sack world record? | Yahoo Answers**
https://answers.yahoo.com/question/?qid... ▾
What's the world record for most toe-stalls back consecutively ... This Site Might Help You. RE:
Hacky sack world record? What&#39;s the world ...

**5-Hour Energy Sued -- Ad Was a Shot to My Hacky Sack ... Says ...**
www.tmz.com/.../5-hour-energy-commercial-sued-hacky-sack-guinness-world-
record-holder/ ▾
Feb 27, 2015 ... 5-Hour Energy DOES NOT give you power to capture the hacky sack world
record, according to the current title holder ... who's suing the ...

**The greatest hacky sack routine of all time. - Wimp.com**

www.wimp.com/the-greatest-hacky-sack-routine-of-all-time/
Apr 7, 2016
Evan Lovely records an outstanding choreographed hacky sack routine
by Nick Landes at the ...

Searches related to the record for Hacky Sack
ted martin hacky sack    most hacky sack hits in a row

the record for Hacky Sack - Google Search
Case: 1:17-cv-02020 Document #: 1 Filed: 03/15/17 Page 42 of 61 PageID #:42
Page 2 of 2

**footbag**
hacky sack games
hacky sack tricks

hacky sack **video**
**how to play** hacky sack
**longest** hacky sack record

**1** 2 3 4 5 6 7 8 9 10      **Next**

Advanced search   Search Help   Send feedback

Google Home   Advertising Programs   Business Solutions   Privacy   Terms
About Google

# <u>Exhibit D</u>



October 2, 2016

To Whom it May Concern,

My name is John Stalberger. In 1972, the late Mike Marshall and myself created a new kicking game using a small beanbag. We called this new game "footbag" and would go on to market this new game under the brand name "Hacky Sack". The term "Hacky Sack" can refer to the game of Hacky Sack or the object used to play the game. The objective of the game of Hacky Sack is to achieve the maximum number of kicks possible without a miss. I personally set the first official world record with 1,518 kicks. For the reasons stated above, I am honored to have been given the title of "Mr. Hacky Sack".

The popularity of this new sport exceeded our wildest dreams. In the first ten years alone, several million Hacky Sacks were sold. We created new games using a footbag and held tournaments that drew competitors and spectators from around the world. The main event in these early years was singles footbag consecutives because the stated objective of the original game was to achieve the maximum number of kicks possible. The ultimate goal of every player was to break my record. The record for most consecutive footbag kicks is the record for the game of Hacky Sack. This record is commonly referred to as either "the footbag world record" or "the record for Hacky Sack".

Today, the singles footbag consecutive record is 63,326 kicks and is held by Ted Martin. This record was established on June 14, 1997 at the Midwest Regional Footbag Championships in Mt. Prospect, IL. Ted Martin's record of 63,326 kicks is recognized the world over as "the record for Hacky Sack".

Sincerely,

John Stalberger

360/ 901-2277

johnfire1112@gmail.com

World Footbag, Inc.

2673 Jacob Circle, Suite 400

Steamboat Springs, Colorado

80477


**World Footbag**

phone

(970) 870-9898

toll free

(800) 878-8797

fax

(970) 870-2846

email

wfa@worldfootbag.com

website

www.worldfootbag.com

September 15, 2016

To whom it may concern,

The sport of footbag (a.k.a. Hacky Sack) is now celebrating its 44th anniversary. In these few short years, footbag has developed into an internationally recognized sport/game enjoyed by millions of players in more than 70 countries.

The World Footbag Association (WFA) was established in 1983 as the sport's promotional arm, and official players' organization. As the founder and director of the WFA, I am responsible for hundreds of promotions each year including the competitive aspect of this very unique sport.

The WFA is the official sanctioning body for all footbag world records. I am responsible for the submission of all footbag world records to Guinness World Records (GWR). I have been GWR's direct contact for footbag since 1982.

World Footbag Association tour teams have traveled the world sharing the benefits and joys of footbag with students and teachers. Each performance includes a reference to the open singles footbag consecutive world record of 63,326 kicks held by Ted Martin. The most frequently asked question in our sport is for the exact number of kicks of this particular record.

The open singles footbag consecutive record is by far the most prestigious, and well known footbag record. The open singles footbag consecutive record is commonly referred to as either "the footbag world record" or "the record for Hacky Sack" because the objective of the original game is to see how many kicks can be achieved without a miss. This simple game format remains the foundation for all new players.

If a person Googles "the footbag world record" or "the record for Hacky Sack" they are provided with the link: http://*worldfootbag.com/current-footbag-guinness-world-records*/ which states in the heading, "Record Holder: Ted Martin/Des Plaines, Illinois, USA Category: Open Singles Footbag Consecutives. Date of Record: June 14, 1997." This link is a page on our website www.worldfootbag.com

If you have any questions or require further information, please do not hesitate to contact me.

Sincerely,

Bruce Guettich
President/World Footbag Association



## Scott Davidson

September 3, 2016

To whom it may concern:

My name is Scott Davidson. I am a long-time footbag event organizer and an accomplished athlete. My footbag resume includes winning the 1999 World Footbag Freestyle Championships, competing in 22 World Footbag Championships around the world, being elected to the Footbag Hall of Fame in 2006, and having currently practiced the art of footbag freestyle for 3,554 consecutive days. I have directed the Midwest Regional Footbag Championships for 20 years in a row and organized special events where numerous footbag world records were established. In addition to this, I have also trained many footbag instructors as the Education Director for the International Footbag Players Association.

I was the director of the event in 1993 when Ted Martin beat his own singles consecutives world record with 51,155 kicks. Veteran players refer to this record as "the footbag world record" while the public commonly refers to this particular record as "the record for Hacky Sack". The Chicago Tribune published an article about this record on June 3, 1997 and directed anyone seeking more information to myself or the World Footbag Association. The article said, "That's the world record for Hacky Sack, or footbag, kicks, set by Ted Martin, 37, of Des Plaines." However, when this article was published, this record had actually fallen to Gary Lautt about a month earlier with an impressive 52,355 kick rally. Ted Martin reclaimed the record on June 14, 1997 at the Midwest Regional Championships with a 63,326 kick rally.

I directed and organized this event and am happy to have witnessed this epic milestone in the history of our sport. Ted Martin's 63,326 kick Guinness World Record has held ever since and is recognized all around the world as "the record for Hacky Sack".

Sincerely yours,

Scott Davidson
Footbag, Lifetime Enthusiast!

1999 World Freestyle Footbag Champion • Footbag Hall of Fame Member
628 W. Harrison Street, Unit G • Oak Park, Illinois 60304
312-952-KICK (5425) • enlightener@footbag.org

To whom it may concern,

My name is Andy Linder. I have been a professional footbag performer for over 30 years and was elected to the Footbag Hall of Fame in 2001. I hold the world record for kicking a footbag the fastest (1019 kicks in five minutes) and hold world records in three different doubles events with my partner Ted Martin. I am also a former world record holder in Open Singles Footbag Consecutives, first breaking the record in 1983 and then breaking my own record four times after that, with a high of 36,230 kicks. The public typically refers to the Open Singles Footbag Consecutives record as "the record for Hacky Sack." Currently, that record is 63,326 kicks and is held by Ted Martin.

Sincerely,

*Andy Linder*
10 - 14 - 16

Andy Linder

630-879-8281

October 27, 2016

To whom it may concern,

My name is Steve Smith. I got my first Hacky Sack in 1981 and joined the World Footbag Association before competing in my first tournament in 1990. I have directed or staffed numerous footbag tournaments and competed in over 90 tournaments. I have served on the International Footbag Advisory Board which sets the rules for our sport and was awarded the Mike Marshal award of excellence for promoting the sport in 2000. I was inducted by my peers into the Footbag Hall of Fame in 2009.

I am writing this letter to define "the record for Hacky Sack". The record for Hacky Sack is the record for the game of Hacky Sack. The objective of the game of Hacky Sack is to see how many consecutive kicks you can achieve without a miss. The most consecutive kicks anyone has ever achieved is listed by the World Footbag Association as "Open Singles Footbag Consecutives." Veteran players usually call this record "the foobag world record" but are well aware that the public refers to this particular record as "the record for Hacky Sack". It is commonly understood by anyone who has ever played Hacky Sack that "the record for Hacky Sack" is the record for most consecutive kicks. The current record is 63,326 consecutive kicks and is held by Ted Martin. This record is the most prestigious record in our sport.

Sincerely,

Steve Smith

Steve Smith
Footbag10@mchsl.com
(815) 825-2646



**WINDY CITY CUP**
**FOOTBAG NET CHAMPIONSHIPS**
PRESENTED BY THE CHICAGO LAKE COAST KICKERS

To Whom It May Concern,

My name is Scot Hansen and I am a footbag player, event organizer, supporter, and enthusiast. I have been playing footbag since I bought my first Hacky Sack brand footbag at a local gift shop in 1988. Since then, I've been the tournament director for over 20 footbag events, including the 1999 World Footbag Championships, which were held in Chicago. Also in 1999, I was awarded the Mike Marshall Award. The Mike Marshall Award is named after one of the co-inventors of Hacky Sack, who sadly passed away in 1975. This award is the highest honor the footbag community bestows on an individual for efforts undertaken in promoting our sport. I am currently the tournament director for the annual Windy City Cup Footbag Net Championships and will be the Net Director for the upcoming 2017 World Footbag Championships in Portland, Oregon.

I'm writing this letter to define "the record for Hacky Sack". The record for Hacky Sack is the record for most consecutive kicks. The objective of the game of Hacky Sack is to see how many consecutive kicks you can achieve without a miss. This is basic knowledge for anyone who has ever seen, played, or even heard of Hacky Sack. Anyone using the term, "the record for Hacky Sack" would be well aware of this or they would not be using the term. The public has referred to the consecutive kicks record as "the record for Hacky Sack" ever since John Stalberger and Mike Marshal invented the game in 1972.

The record for Hacky Sack is 63,326 kicks and is held by Ted Martin. I personally witnessed a portion of this incredible record-setting rally on June 14, 1997 at the Midwest Regional Footbag Championships. Ted Martin's achievement is the most well-known, respected, and coveted title in the sport of footbag. For the makers of 5-hour Energy to claim in a television commercial that "the record for Hacky Sack" was achieved because of 5-hour Energy is a new low in false advertising.

Always kicking,

Scot Hansen
On behalf of the Chicago Lake Coast Kickers
www.windycitycup.org

From: **Steve Richardson** srichardsonrealtor@me.com
Subject: **Ted Martin's Footbag (Hacky Sack) World Record**
Date: **November 16, 2016 at 8:39 PM**
To: **Mr. Ted Martin** thetedmartin@gmail.com

November 12, 2016

To whom it may concern,

My name is Steve Richardson. I am a certified footbag instructor with the International Footbag Players Association. I've been an active member of the footbag community since 1985 and have competed in many footbag tournaments. Veteran players refer to our sport as "Footbag" while the public generally refers to our sport as "Hacky Sack". The objective of the game of Hacky Sack is clear to anyone who has ever seen it played. How many kicks can you achieve without a miss? The record for Hacky Sack is the most kicks anyone has ever achieved. The definition of "the record for Hacky Sack" is so obvious that any person who has ever heard of Hacky Sack would have to know that "the record for Hacky Sack" is the record for most consecutive kicks. Anyone who suggests otherwise is being completely dishonest.

The record for Hacky Sack is 63,326 kicks and is held by Ted Martin. I personally witnessed this feat from the front row as I was one of the volunteers who counted for this Guinness World Record. Ted Martin's record required truly awesome skill, a tremendous amount of endurance, and he was able to maintain his concentration for nearly nine hours! The extreme mental and physical toughness required to achieve this record is the reason why it has held for almost twenty years and may never be broken again. For the makers of 5-hour Energy to claim that "the record for Hacky Sack" was achieved because of 5-hour Energy is nothing less than an outrage.

Sincerely,

Steve Richardson
900 N. Lake Shore Drive #1513
Chicago, IL 60611
steverichardsonyoga@me.com
(312) 953-1282

# **Exhibit E**

E

## Illinois Compiled Statutes

### Information maintained by the Legislative Reference Bureau

Updating the database of the Illinois Compiled Statutes (ILCS) is an ongoing process. Recent laws may not yet be included in the ILCS database, but they are found on this site as Public Acts soon after they become law. For information concerning the relationship between statutes and Public Acts, refer to the Guide.

Because the statute database is maintained primarily for legislative drafting purposes, statutory changes are sometimes included in the statute database before they take effect. If the source note at the end of a Section of the statutes includes a Public Act that has not yet taken effect, the version of the law that is currently in effect may have already been removed from the database and you should refer to that Public Act to see the changes made to the current law.

## PROPERTY
## (765 ILCS 1075/) Right of Publicity Act.

(765 ILCS 1075/1)
Sec. 1. Short title. This Act may be cited as the Right of Publicity Act.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/5)
Sec. 5. Definitions. As used in this Act:
"Commercial purpose" means the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising.
"Identity" means any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice.
"Individual" means a living or deceased natural person, regardless of whether the identity of that individual has been used for a commercial purpose during the individual's lifetime.
"Juristic person" means a partnership, trust, estate, corporation, unincorporated association, or other organization capable of suing and being sued in a court of law.
"Name" means the actual name or other name by which an individual is known that is intended to identify that individual.
"Person" means a natural or juristic person.
"Work of Fine Art" means (i) a visual rendition including, but not limited to, a painting, drawing, sculpture, mosaic, videotape, or photograph; (ii) a work of calligraphy; (iii) a work of graphic art including, but not limited to, an etching, lithograph, serigraph, or offset print; (iv) a craft work in materials including, but not limited to, clay, textile, fiber, wood, metal, plastic, or glass; or (v) a work in mixed media including, but not limited to, a collage, assemblage, or work consisting of any combination of items (i) through (iv).

(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/10)
Sec. 10. Recognition of right of publicity. The right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/15)
Sec. 15. Transferability, descendability, and divisibility. The rights under this Act are property rights that are freely transferable in whole or in part to any person either by written transfer, including but not limited to wills and trusts, or by intestate succession only to an individual's spouse, parents, children, and grandchildren, except that the rights under this Act are not subject to levy or attachment and may not be the subject of a security interest. Nothing in this Section limits the ability of any party to levy, attach, or obtain a security interest in the proceeds of the rights under this Act or the proceeds of the exercise of those rights.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/20)
Sec. 20. Enforcement of rights and remedies.
(a) The rights and remedies set forth in this Act may be exercised and enforced by:
(1) an individual or his or her authorized representative;
(2) a person to whom the recognized rights have been transferred by written transfer under Section 15 of this Act; or
(3) after the death of an individual who has not transferred the recognized rights by written transfer under this Act, any person or persons who possesses an interest in those rights.
(b) Each person described in paragraph (3) of subsection (a) shall make a proportional accounting to, and shall act at all times in good faith with respect to, any other person in whom the rights being enforced have vested.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/25)
Sec. 25. Termination of rights of deceased individual. The rights set forth in this Act terminate if:
(a) a deceased individual has not transferred his or her rights in writing under Section 15 of this Act; and
(b) the individual has no living spouse, parents, children, or grandchildren.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/30)
Sec. 30. Limitations regarding use of an individual's identity.
(a) A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their

Case: 1:17-cv-02020 Document #: 1 Filed: 03/15/17 Page 54 of 61 PageID #:54

authorized representative.
    (b) If an individual's death occurs after the effective
date of this Act, a person may not use that individual's
identity for commercial purposes for 50 years after the date
of the individual's death without having obtained previous
written consent from the appropriate person or persons
specified in Section 20 of this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

    (765 ILCS 1075/35)
    Sec. 35. Applicability.
    (a) This Act applies to acts or events that take place
after the effective date of this Act.
    (b) This Act does not apply to the following:
        (1) use of an individual's identity in an attempt to
portray, describe, or impersonate that individual in a
live performance, a single and original work of fine art,
play, book, article, musical work, film, radio,
television, or other audio, visual, or audio-visual work,
provided that the performance, work, play, book, article,
or film does not constitute in and of itself a commercial
advertisement for a product, merchandise, goods, or
services;
        (2) use of an individual's identity for
non-commercial purposes, including any news, public
affairs, or sports broadcast or account, or any political
campaign;
        (3) use of an individual's name in truthfully
identifying the person as the author of a particular work
or program or the performer in a particular performance;
        (4) promotional materials, advertisements, or
commercial announcements for a use described under
paragraph (1), (2), or (3) of this subsection; or
        (5) use of photographs, videotapes, and images by a
person, firm, or corporation practicing the profession of
photography ("professional photographer") to exhibit in or
about the professional photographer's place of business or
portfolio, specimens of the professional photographer's
work, unless the exhibition is continued by the
professional photographer after written notice objecting
to the exhibition has been given by the individual
portrayed.
(Source: P.A. 90-747, eff. 1-1-99.)

    (765 ILCS 1075/40)
    Sec. 40. Violations; monetary relief.
    (a) A person who violates Section 30 of this Act may be
liable for either of the following, whichever is greater:
        (1) actual damages, profits derived from the
unauthorized use, or both; or
        (2) $1,000.
    (b) Punitive damages may be awarded against a person found
to have willfully violated Section 30 of this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

    (765 ILCS 1075/45)
    Sec. 45. Establishment of profits. In establishing profits
under paragraph (1) of subsection (a) of Section 40 of this
Act:

(a) the plaintiff is required to prove the damages or gross revenue attributable to the unauthorized use; and
(b) the defendant is required to prove properly deductible expenses.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/50)
Sec. 50. Injunctive relief. Upon a showing of cause as required by Article XI of the Code of Civil Procedure for the issuance of injunctive relief, the court may issue such temporary restraining orders, preliminary injunctions, and permanent injunctions as may be appropriate under this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/55)
Sec. 55. Attorney's fees; costs. The court may award to the prevailing party reasonable attorney's fees, costs, and expenses relating to an action under this Act.
(Source: P.A. 90-747, eff. 1-1-99.)

(765 ILCS 1075/60)
Sec. 60. Rights and remedies. The rights and remedies provided for in this Act are meant to supplant those available under the common law as of the effective date of this Act, but do not affect an individual's common law rights as they existed before the effective date of this Act. Except for the common law right of publicity, the rights and remedies provided under this Act are supplemental to any other rights and remedies provided by law including, but not limited to, the common law right of privacy.
(Source: P.A. 90-747, eff. 1-1-99.)

Top

(735 ILCS 5/13-205) (from Ch. 110, par. 13-205)
    Sec. 13-205. Five year limitation. Except as provided in Section 2-725 of the "Uniform Commercial Code", approved July 31, 1961, as amended, and Section 11-13 of "The Illinois Public Aid Code", approved April 11, 1967, as amended, actions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.
    (Source: P.A. 82-280.)

# Exhibit F





HOME    MUSIC    MASS APPEAL    VIDEOS    FASHION    SPORTS    CONTACT

f ♥ 8· 🖂 ▢ t | Q



RECENT POSTS

Did Rihanna have her accountant KIDNAPPED over $9 MILLION bucks?

Playing With Fire and Explosions – Steve-O

Mother Loses Three Kids to Chiraq Over Three Decades

NFL Star Almost Dies on 4th of July!!!

Crazy photo of crow riding on the back of a bald eagle

CULTURE                                                                    0 Comments

# Hacky Sack World Record Holder Is Filing A Stupid Lawsuit

*By THE TERMINATOR  ⚡@THEBLKDMNDS · On February 28, 2015*

Start Download

Convert Any File to a PDF. Get The Free FromDoctoPdf Toolbar!
○ ○

Use your ← → (arrow) to visit the prev/next page!          Prev post    1 of 2    Next

This is probably some of the most ridiculous s**t I've ever heard. Hacky sack hall of famer **Ted Martin** is filing a lawsuit against the company **5-Hour Energy**. Martin has held a Guiness World Record for hacky sack since 1997. It's one thing to be a professional athlete, but another to be a pro hacky sacker. So what's this lawsuit even about?

**Martin** holds a few hacky sack records like hackying for over 8 hours with a total of 63,326. He was just featured in the 5-Hour Engergy drink commercial, and he's mad that the company has made false claims about him. In the commercial they

Case: 1:17-cv-02020 Document #: 1 Filed: 03/15/17 Page 59 of 61 PageID #:59

claim that "he mastered origami while beating the record for hacky sack", but Martin says that this is "literally false" information. He feels as if the company made it look like the drink took his belt, and it was the reason he won.

He has a lawsuit that he has hand written and plans on claiming. He even wants the company to stop airing the commercial. The real question is that if he didn't use the 5-Hour Energy drink, then why did he agree to filming the commercial? He knew they were going to use false advertising and claim unrealistic things, he was aware. Chances are though, that the court is just going to laugh at him and throw it out. Check out the commercial on the next page.

Use your ← → (arrow) to visit the prev/next page!        Prev post   1 of 2   Next





1 Rule of a flat stomach :
∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞
Cut down a bit of stomach fat every
day by using this 1 weird old tip.                Tip ▶

5 HOUR ENERGY DRINK    GUINESS WORLD RECORD    HACKY SACK    TED MARTIN

SHARE        Tweet  0         Like  50        8+1  0



**THE TERMINATOR**

The Terminator (also known as the T-800, T-850, or Model 101)—a cyborg. The Terminator is an infiltration unit, part man - part machine. Underneath it's a hyperalloy combat chassis, microprocessor-controlled, fully armored, very tough. But outside it's living human tissue. Flesh, skin, hair, blood, grown for the cyborgs.



1 Rule of a
flat stomach :

Cut down a bit of
stomach fat every
day by using this
1 weird old tip.

➡ Tip

GET SOCIAL ///

Follow @THEBLKDMNDS   17.5K followers

Ads by Adblade


**Custom banking solutions available with BMO Harris Small Business Builder.**


**Open a BMO Harris checking account with qualifying direct deposits and get a $150 cash**


**Shocking joint ingredient could fix knees in just 1 week?**


**Ever Looked Yourself Up? New Site Reveals More Than You'll Believe!**


**Myrtle Beach Summer Deals - Save up to 40%. Package specials, resort credits and more!**


**Illinois Drivers Can't Believe They Did Not Know This New Rule...**


**Illinois Drivers Feel Stupid For Not Knowing This New Rule**


**Des Plaines Drivers are Furious Over This 1 New Rule...**


**Luxury doesn't have to be out of reach. Our list of 10 Luxury Cars Under $40,000 is proof.**


**Who knew Apple Cider Vinegar could do this...**


**Thirteen Actors Who Really Packed on the Muscle For Big Movie Roles**


**33 Stars Who Died Too Young**

YOU MIGHT ALSO LIKE



CULTURE

Aaron Hernandez Murder Trial Gets Bomb Threats

CULTURE

Nike Air Tech Challenge 4 Low Anthracite/White

CULTURE

KITH "Tokyo Sakura Project" Lookbook

**0 Comments**     blkdmnds.com                          🔵 Login ⌄

💜 Recommend     ⬆ Share                               Sort by Best ⌄

Start the discussion…

Be the first to comment.



1 Tip of a fast metabolism

Cut down a bit of stomach fat every day by using this 1 weird old tip

➤ 1 Tip

Ads by Adblade

Custom banking solutions available with BMO Harris Small Business

Open a BMO Harris checking account with qualifying direct deposits and get

Shocking joint ingredient could fix knees in just 1 week?

Ever Looked Yourself Up? New Site Reveals More Than You'll

Myrtle Beach Summer Deals - Save up to 40%. Package specials, resort

New Rule in Illinois Leaves Drivers Furious and Shocked

 

**Who knew Apple Cider Vinegar could do this...**

**16 Child Stars Who Grew Up To Be Super Attractive**

## 2015 Top Wrinkle Creams

5 Best Anti-Aging Creams Reviewed. Results Without Surgery or Needles!

f ⊻ 8 ⊠ ▣ t

© 2013 BLKDMNDS. All rights reserved. LXXXVII